## IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **HERSHEY ENTERTAINMENT &** | : | **CIVIL ACTION NO. 1:04-CV-2641** |
| **RESORTS COMPANY,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **INTERACTIVE RIDES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

## MEMORANDUM

Presently before the court are cross motions (Docs. 28, 30) for summary judgment on the claims of plaintiff/counterclaim defendant, Hershey Entertainment & Resorts Company ("Hershey"), and defendant/counterclaim plaintiff, Interactive Rides, Inc. ("IR").  Hershey seeks summary judgment on its anticipatory repudiation and fraudulent inducement to contract claims and on IR's breach of contract counterclaim.  IR seeks summary judgment on Hershey's gross negligence and unjust enrichment claims and a declaratory judgment on the scope of damages available to Hershey under the contract.  For the reasons that follow, the motions will be granted in part and denied in part.

## I.    **Statement of Facts**[1]

In late 2003, Hershey, an amusement park operator, and IR, an amusement ride contractor, embarked on discussions of a new roller coaster—the Frequent

---

[1] In accordance with the standard of review for a motion for summary judgment and in light of the cross motions for summary judgment, the court will present the facts in the light most favorable to the non-moving party on a particular issue.  See infra Part II.

Faller Ride—at Hershey's amusement park, Hersheypark.  (Doc. 32 ¶ 1; Doc. 32,

Attach. 1.)  Hershey was interested in the installation of a 150-foot Frequent Faller

Ride ("Ride"), ready for operation by May 2005.  Negotiations ensued and, in

February 2004, Hershey requested from IR a timetable to ensure that the Ride

would be operational by May 2005.  (Doc. 32, Attach. 2.)  IR initially advised Hershey

that it required a finalized order for the Ride by April 1, 2004 in order to meet the

May 2005 deadline (Doc. 32, Attach. 3), but subsequently agreed to extend the April

1, 2004 due date and communicated to Hershey a willingness to work within

Hershey's schedule.  (Doc. 32, Attachs. 4-5.)

In March 2004, IR presented Hershey with a detailed proposal for the Ride,

which included a total purchase price of $1,995,000.  (Doc. 32 ¶ 6; Doc. 2, Ex. 1.)  In

response to Hershey's inquiries, IR advised Hershey that it would provide a ladder

with the Ride for maintenance and evacuation.  (Doc. 32, Attach. 7.)  In the

alternative, IR offered to provide a man-lift at an additional cost.  (Doc. 32,

Attach. 7.)

On March 22, 2004, IR advised Hershey that it anticipated significant

increases in the price of steel.  (Doc. 2, Ex. 2.)  Specifically, IR advised that "the

price is expected to triple by late spring" and that "if [IR] can get a commitment

from [Hershey] before May [2004, IR] can lock in steel pricing before it triples in

cost to [IR]."  (Doc. 2, Ex. 2.)  And IR confirmed that any increase in the cost of steel

would not affect its prior proposal for the Ride:

> We have not increased the price of the 150 foot coaster as we have
> given you a formal quotation and proposal on this ride, and we will
> stand by that price.  We also will not request additional money for the
> ride or a change order to the project, due to increased steel costs.  We
> will hold firm with our price and provide you the complete ride within
> the time frame we commit to in our final agreement.

(Doc. 2, Ex. 2.)

On April 23, 2004, Hershey and IR executed a written contract—Equipment

Purchase Agreement ("Agreement")—by terms of which Hershey agreed to

purchase the Ride for $1,995,000 .  (Doc. 2, Ex. 3.)  The contract set forth the

following payment schedule:

| | |
|---|---|
| 10% ($199,500) Down payment | May 17, 2004  Payment to kick off engineering phase and start ride process |
| 10% ($199,500) Production payment | August 1, 2004  Payment to be made upon completion of preliminary design |
| 20% ($399,000) Production payment | October 1, 2004  Payment to be made after final design is finished and for fabrication progress payment |
| 30% ($598,500) "Local Operation Payment | January 1, 2005  Payment to be made upon successful demonstration of the ride operation in Logan, UT. |
| 20% ($399,000) Operation Payment | May 1, 2005  Payment to be made after successful operation demonstration at Hersheypark. |
| 10% ($199,500) Operation Payment | June 1, 2005  Payment to be made after 30 days of operation. |

(Doc. 2, Ex. 3 at 1 ¶ 1.)  The contract provided that IR would not be responsible for any delays to the project schedule caused by Hershey, including any modifications to the Ride requested by Hershey.  (Doc. 2, Ex. 3 at 2.)

Under the contract, IR agreed to demonstrate the successful operation of the Ride in Hersheypark by May 1, 2005.  (Doc. 32 ¶ 12; Doc. 2, Ex. 3 at 1 ¶ 1.)  IR also agreed that the Ride would have seven vehicles, each with four seats.  (Doc. 2, Ex. 3 at 2 ¶ 5.)  And, regarding the emergency evacuation for the Ride, the Agreement provided that "IR will provide spiral stairs up to the top of the ride near the lift and catwalks to all block points to be used for evacuation."  (Doc. 2, Ex. 3 at 4.)

On May 14, 2004, Hershey and IR executed a written addendum ("Addendum") to the Agreement (Doc. 2, Ex. 4), containing a choice of law provision deferring to Pennsylvania law (Doc. 2, Ex. 4 § 15.1).  The Addendum established the procedure for any material alterations to the Ride, including the requirement that a change order identify any applicable adjustments to the purchase price or delivery date.  (Doc. 2, Ex. 4 §§ 3.1-3.2.)  Further, it reiterated Hershey's reliance on the May 1, 2005 deadline for a fully operational Ride:

> 7.2   By executing this Addendum, [IR] acknowledges that [Hershey] intends to advertise the Ride as a major new attraction for the 2005 Park season, which Ride is to be fully operational for Opening Day of the Park's 2005 season, and [IR] further acknowledges that time is of the essence for performance of its obligations under the Agreement.  [IR] shall complete the delivery of all of the Equipment on, or before, March 28, 2005, and shall provide the Equipment and services required by this Agreement on or before the dates prescribed by this Agreement . . . .

4

(Doc. 2, Ex. 4 § 7.2.)[2]

The Addendum also contained several provisions regarding remedies and

damages, (see Doc. 2, Ex. 4 §§ 7.1, 9.1, 16.9), including the following provision:

> 7.1    The failure of [IR] to perform any of its material obligations
> under this Addendum or the Agreement and/or to comply with
> the material covenants, conditions and provisions thereof, shall
> constitute a default by [IR].  In the event of such default,
> [Hershey] may give written notice thereof to [IR], identifying the
> default and directing [IR] to cure the default within fifteen (15)
> days or, if the default cannot practically be cured within that
> amount of time, then within a reasonable time.  If [IR] fails to so
> cure said default, [Hershey] may commence an action for
> damages.

(Doc. 2, Ex. 4 ¶ 7.1.)  The Addendum also provided for liquidated damages in the

event that IR failed to meet the delivery date by seven days or more.[3]  (Doc. 2, Ex. 4

§ 7.2.)  However, the Addendum did not change the purchase price, time and

manner of payment, or shipping dates.  (Doc. 2, Ex. 4 § 2.1.)

Pursuant to the Agreement, Hershey paid IR the deposit of $199,500 in May

2004 and the first production payment of $199,500 in September 2004.[4]  (Doc. 32

---

[2] Hershey issued a press release on September 27, 2004 announcing the new
Ride (called "Turbulence") for the 2005 operating season.  (Doc. 32, Attach. 19.)  The
press release detailed the operation of the new Ride and described its location
within Hersheypark.  (Doc. 32, Attach. 19.)

[3] The Addendum specified that Hershey must claim liquidated, not actual,
damages for any losses due to delay.  (Doc. 2, Ex. 4 § 7.2.)

[4] The parties dispute whether IR completed the preliminary design by
August 1, 2004, which triggered Hershey's duty to make the first production
payment.  (See Doc. 38, Ex. A ¶¶ 12, 29; Doc. 13 ¶ 22; Doc. 7 ¶ 22.)

¶ 20.)  However, Hershey never made the second production payment of $399,000.[5]

IR contends that, except for incorporating the man-lift which Hershey requested

post-contract,[6] the design drawings were completed by October 1, 2004, obligating

Hershey to remit the second production payment.[7]  (Doc. 38, Ex. A ¶¶ 10-11, 13;

Doc. 38, Ex. C.)  According to IR's president, Edward Clay Slade ("Slade"), IR's

engineers could not incorporate the man-lift into the designs because Hershey did

not provide IR with the man-lift or technical drawings of the man-lift.  (Doc. 38,

Ex. A ¶ 13.)  The record reflects that Hershey submitted a change order regarding

the man-lift on November 9, 2004, in which it agreed to a $67,500 increase in the

price of the Ride.  (Doc. 38, Ex. C.)

    In early November 2004, IR received significantly higher price quotes from

its steel vendors.  (Doc. 38, Ex. A ¶ 14.)  IR notified Hershey of these increases and,

at Hershey's request, prepared a letter ("Proposal Letter #1") with proposals for

resolving the cost overrun issue.  (Doc. 2, Ex. 5; Doc. 38, Ex. A ¶¶ 15-16, 18.)

    One of the suggested resolutions was to increase the total cost of the project

to $3,429,962, with IR covering $250,000 of the increase and Hershey covering the

---

[5] IR asserts that it had incurred more than $645,000 in costs and had only
been paid $399,000 at the time Hershey commenced the instant action.  (Doc. 38
¶ 27.)  IR admits that, under the contract with Hershey, it did not expect to make a
profit on the sale of the Ride.  (Doc. 38 ¶ 7.)

[6] Incorporating the man-lift required the design of various means of access
from the man-lift to the catwalks.  (Doc. 38, Ex. C.)

[7] Hershey asserts that IR never completed the final design.  (Doc. 31 at 19.)

remaining $1,117,462.[8]  (Doc. 2, Ex. 5 at 4.)  A second proposal incorporated the use

of international steel fabricators to reduce costs.  (Doc. 2, Ex. 5 at 4.)  Again, IR

offered to cover $250,000 of any increase in cost and proposed that Hershey cover

the rest.[9]  In the letter summary, IR stated:

> As we have said before, we are committed to the success of this coaster
> project.  We hope you find either of these two proposals acceptable.
> However, for your information, we feel that [the first proposal] is the
> only option we have to finish this "Turbulence" coaster for next season
> at Hersheypark.

(Doc. 2, Ex. 5 at 4.)  As for its explanation of the cost overrun issue, IR stated:

> The original ride cost quotations that were used to price the ride we
> sold you in April, 2004 were based upon various ride component
> pricing proposals we received for the first time in August 2003, and re-
> issued for verification in February, 2004 for the impending ride order
> from Hersheypark.  We requested our final quotations on steel in
> October before we placed our order, as our steel fabricators will not
> book steel, or hold pricing until an exact order is placed.[10]

(Doc. 2, Ex. 5 at 2.)

According to Slade, IR and Hershey engaged in numerous discussions

throughout November 2004 regarding this cost overrun issue; in all but one of the

discussions, Hershey continued to request proposals.  (Doc. 38, Ex. A ¶ 19.)  The

---

[8] To reduce the overall costs by $130,500, this proposal also contemplated the
removal of one vehicle from the project schedule.  (Doc. 2, Ex. 5.)

[9] IR did not have a final pricing breakdown for this second proposal.  (Doc. 2,
Ex. 5 at 4.)

[10] In further explanation, IR gave three reasons for the overrun:  (1) the price
of steel increased, (2) the price to fabricate steel and some other components
increased, and (3) the fabrication process for this ride was more complex than
originally projected.  (Doc. 2, Ex. 5 at 2.)

exception was Hershey's letter ("Demand Letter") personally delivered to Slade

and IR's sales director, Val Potter ("Potter"), during a November 17, 2004 meeting.

(Doc. 38, Ex. A ¶ 20.)  In the letter, Hershey stated:

> In accordance with Sections 7.0 and 13.0 of the Addendum . . . ,
> this letter shall serve as formal notice that Interactive's failure to
> perform material obligations under the Agreement and to comply with
> the material covenants, conditions and provisions thereof, constitute a
> default by Interactive. . . .
>
> Additionally, in response to your [Proposal Letter #1], we
> seriously regret that you have determined that Interactive is unable to
> perform the fabrication, construction and other material obligations as
> required by the Agreement for the Purchase Price of . . . $1,995,000.00
> . . . .  While you attempt to offer excuses for Interactive's inability to
> meet its contractual obligations, please be advised that we view your
> statements as a repudiation of the Agreement and a breach of contract.
> Unless we receive, by December 2, 2004, specific written assurances (in
> form and content reasonably acceptable to us) of Interactive's
> willingness and ability to comply with all of its obligations under the
> Agreement, including but not limited to performance at the agreed
> upon Purchase Price, we will be left with no choice but to conclude
> that this breach will not be cured as provided by the Agreement.

(Doc. 2, Ex. 6.)  During the November 17th meeting, Slade and Potter verbally

assured Hershey that IR was committed to the project and intended to perform its

contractual obligations.  (Doc. 38, Ex. A ¶ 20.)

Following IR's verbal assurance, Hershey continued to request proposals to

resolve the cost overrun issue.  (Doc. 38, Ex. A ¶ 24.)  On November 30, 2004, IR

responded to these requests by submitting another proposal letter to Hershey

("Proposal Letter #2").  (Doc. 38, Ex. A ¶ 24.)  The new proposal still involved the

removal of one vehicle from the project schedule and the increased cost with IR

covering $250,000 and Hershey initially covering $1,117,462.  (Doc. 2, Ex. 7 at 4-5.)

However, under the new proposal, IR would return $500,000 to Hershey by

remitting $50,000 for each of the next ten Frequent Faller Rides that IR sold.

(Doc. 2, Ex. 7 at 4-5.)

One week later, on December 6, 2004, IR responded in writing to Hershey's

Demand Letter.  (Doc. 38, Ex. A ¶ 23; Doc. 38, Ex. B.)  IR's response ("Assurances

Letter") stated:

> IR has not repudiated its agreement with Hershey.  It is true
> that IR has asked Hershey to consider modifications to the Agreement
> in light of escalating material and fabrication costs, and in light of IR's
> inability to make a profit under the current pricing structure.
> However, IR has never indicated that it would not continue to perform
> its obligations under the Agreement. . . . While IR intends to continue
> its performance under the Agreement, IR now believes there may
> likely be significant delays in delivering the ride caused by Hershey's
> changes to the ride design and by the potential need to have significant
> portions of the ride fabricated overseas.  The potential for delay is
> anticipated in the Agreement, and IR is aware that delivery delays
> may, where caused by the fault of IR, trigger the liquidated damages
> provisions of the Agreement. . . .
>
> As requested, IR hereby advises Hershey that IR is willing and
> able to perform its obligations under the Agreement at the agreed
> upon purchase price.  This does not mean, however, that IR should
> bear the cost of Hershey's changes, or that Hershey should refuse to
> consider pricing changes due to the rise in materials and fabrication
> costs.  Additionally, delivery of the drawings and the ride may be
> significantly delayed due to the issues raised in IR's [Proposal Letter
> #1].  Should Hershey desire additional assurances, please let us know.

(Doc. 38, Ex. B.)

The following day, Hershey commenced the instant action (Doc. 1) against

IR, seeking damages for:  (1) fraudulent inducement to contract, (2) breach of

contract, (3) anticipatory repudiation of contract, (4) gross negligence, and (5) unjust

enrichment.  IR responded with a breach of contract counterclaim.[11]  (Doc. 7.)

IR and Hershey filed the instant motions (Docs. 28, 30) for summary

judgment on August 12, 2005.  IR's motion (Doc. 28) seeks summary judgment on

Hershey's gross negligence and unjust enrichment claims and a declaratory

judgment on the scope of damages available to Hershey under the contract.

Hershey's motion (Doc. 30) seeks summary judgment on its anticipatory

repudiation and fraudulent inducement to contract claims and on IR's breach of

contract counterclaim.  The parties have briefed the issues and the motions are now

ripe for disposition.

## II.   <u>**Standard of Review**</u>

Through summary adjudication the court may dispose of those claims that do

not present a "genuine issue of material fact," and for which a jury trial would be an

empty and unnecessary formality.  It places the burden on the non-moving party to

come forth with "affirmative evidence, beyond the allegations of the pleadings," in

support of its right to relief.  <u>Pappas v. City of Lebanon</u>, 331 F. Supp. 2d 311, 315

---

[11] IR contends that Hershey breached the contract by:  (1) failing to make the
first production payment on or before August 1, 2004; (2) failing to provide IR with
either adequate engineering and technical specifications for the man-lift or
possession of the unassembled man-lift; (3) failing to make the second production
payment on or before October 1, 2004; (4) failing to agree to increase, or to negotiate
an increase, to the Ride price to account for material changes requested by
Hershey; (5) failing to negotiate in good faith regarding contract modifications to
account for material changes in circumstances; and (6) unilaterally repudiating and
terminating the contract by filing the instant lawsuit.  (Doc. 7 ¶ 58.)

(M.D. Pa. 2004); FED. R. CIV. P. 56(e); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  This evidence must be adequate, as a matter of law, to sustain a judgment in favor of the non-moving party on the claims.  See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250-57 (1986); Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587-89 (1986); see also FED. R. CIV. P. 56(c), (e).  Only if this threshold is met may the cause of action proceed.  Pappas, 331 F. Supp. 2d at 315.

## III.   Discussion[12]

### A.   Gross Negligence

IR contends that Hershey's claim of gross negligence is barred by the "gist of the action" doctrine.  Under the "gist of the action" doctrine, a tort claim based on the failure to fulfill contractual duties can only be maintained if the contract is "collateral" to conduct that is primarily tortious.  Bohler-Uddeholm Am., Inc. v. Ellwood Group, Inc., 247 F.3d 79, 103 (3d Cir. 2001); Sunquest Info. Sys., Inc. v. Dean Witter Reynolds, Inc., 40 F. Supp. 2d 644, 650 (W.D. Pa. 1999); see also School Lane House Phila., LLC v. Rait Partnership, L.P., No. Civ.A. 04-3821, 2005 WL 2397146, at *4 (E.D. Pa. Sept. 27, 2005); Factory Mkt., Inc. v. Schuller Int'l, Inc., 987 F. Supp. 387, 394 (E.D. Pa. 1997) (providing that a party cannot avoid the "gist of the

---

[12] Jurisdiction over the instant action is based on diversity of citizenship, see 28 U.S.C. § 1332, and neither party disputes the applicability of Pennsylvania law, see Erie R.R. Co. v. Tompkins, 304 U.S. 64, 79-80 (1938), as specified in the Addendum.  See Compagnie des Bauxites de Guinee v. Argonaut-Midwest Ins. Co., 880 F.2d 685, 688-89 (3d Cir. 1989).

action" doctrine by alleging that defendant acted negligently by failing to fulfill

contractual duties).

In the matter *sub judice*, the contract at issue is clearly essential to the

alleged tortious conduct.  Hershey bases its claim of gross negligence on IR's "duty

to secure materials and services it needed, at a time when [IR] could afford them, to

achieve [IR's] commitment to [Hershey] under [the] contract."  (Doc. 1 ¶ 49.)

Hershey alleges that IR breached this duty by not timely securing the materials and

services needed to perform under the contract.  (See Doc. 1 ¶ 50.)  The duty at issue

is a contractual one, not a socially-imposed duty subject to tort law.[13]  See Phico Ins.

Co. v. Presbyterian Med. Servs. Corp., 663 A.2d 753, 757 (Pa. Super. Ct. 1995)

(distinguishing between obligations under contract law, which are "imposed by

mutual consensus," and obligations under tort law, which are "imposed as a matter

of social policy").

---

[13] Hershey cites several cases for its contention that the "gist of the action"
doctrine does not apply to its gross negligence claim.  (See Doc. 33 at 18-19.)  These
cases, however, involve allegations of fraud, not negligence.  See Am. Guarantee &
Liab. Ins. Co. v. Fojanini, 90 F. Supp. 2d 615, 623 (E.D. Pa. 2000); Fox's Food, Inc. v.
Kmart Corp., 870 F. Supp. 599, 609 (M.D. Pa. 1994); Polymer Dynamics, Inc. v.
Bayer Corp., No. CIV. A. 99-4040, 2000 WL 1146622, at *6-7 (E.D. Pa. Aug. 14, 2000);
Northeastern Power Co. v. Balcke-Durr, Inc., No. 97-CV-4836, 1999 WL 674332, *12
(E.D. Pa. Aug. 23, 1999).  In addition, Hershey's allegation of fraud against IR
involves alleged misrepresentations made *before the execution of the contract*, not
misrepresentations about the *breach of contract*.  (See Doc. 1 ¶ 48.)  Such an
allegation is properly brought as a fraudulent inducement claim.  (See Doc. 1
¶¶ 35-40.)

Because the contract is not merely collateral to Hershey's claim of gross negligence, the "gist of the action" doctrine bars Hershey's gross negligence claim. Accordingly, IR's motion for summary judgment on this claim will be granted.

## B.   Unjust Enrichment

IR asserts that Hershey's unjust enrichment claim should be dismissed because an express, written agreement exists between the parties.  Under Pennsylvania law, unjust enrichment is quasi-contractual, occurring when one party is "unjustly enriched at the expense of another."  Mitchell v. Moore, 729 A.2d 1200, 1202 n.2 (Pa. Super. Ct. 1999).  The elements for unjust enrichment are: "(1) benefits conferred on defendant by plaintiff; (2) appreciation of such benefits by defendant; and (3) acceptance and retention of such benefits under such circumstances that it would be inequitable [or unconscionable] for defendant to retain the benefit without payment of value."  Id. at 1203.  However, a party may not assert an unjust enrichment claim when there is a written or express agreement governing the relationship between the parties.[14]  See id.; see also Benefit Trust Life Ins. Co. v. Union Nat'l Bank of Pittsburgh, 776 F.2d 1174, 1177 (3d Cir. 1985)

_____

[14] Hershey's quotation that unjust enrichment is appropriate where a defendant "is in possession of money or property which in good conscience and justice, he should not retain but should deliver to another" is incomplete (see Doc. 33 at 22-23).  William A. Meier Glass Co. v. Anchor Hocking Glass Corp., 95 F. Supp. 264, 268 (W.D. Pa. 1951).  Hershey omits the beginning of the quotation, which reads: "[Unjust enrichment] applies to situations where as a matter of fact there is no legal contract."  Id.  Counsel is admonished to avoid such glaring omissions in future submissions to the court.  See PA. RULES PROF'L CONDUCT R. 3.3(a) (providing for candor toward the court); see also L.R. 83.23.2 (adopting Pennsylvania Rules of Professional Conduct).

(citing Schott v. Westinghouse Elec. Corp., 259 A.2d 443, 448 (Pa. 1969)); Fox's Food, Inc. v. Kmart Corp., 870 F. Supp. 599, 611 (M.D. Pa. 1994).

In the matter *sub judice*, the relationship between Hershey and IR is based on a written contract and neither party contends that it is unenforceable.[15]  See id. (granting summary judgment with respect to an unjust enrichment claim "[b]ecause it cannot be concluded as a matter of law that the [contract] was invalidly formed or that it is so ambiguous as to be unenforceable").  Thus, the quasi-contractual doctrine of unjust enrichment is inapplicable and the court will grant IR's motion for summary judgment on this claim.

### C.    Anticipatory Repudiation

Hershey also asserts that it is entitled to summary judgment on Count III (Anticipatory Repudiation) because IR's Proposal Letter #1 constituted an anticipatory repudiation and because IR's Proposal Letter #2 and Assurances Letter did not give adequate assurances of IR's willingness and ability to perform under the contract.  Under Pennsylvania law, anticipatory repudiation occurs when there is "an *absolute* and *unequivocal* refusal to perform or a distinct and positive statement of an inability to do so."  Edwards v. Wyatt, 335 F.3d 261, 272 (3d Cir. 2003) (quoting 2401 Pa. Ave. Corp. v. Fed'n of Jewish Agencies, 489 A.2d 733, 737

---

[15] Although Hershey has claimed fraudulent inducement to contract against IR, Hershey is seeking damages, not recission of the contract.  (Doc. 1 ¶ 40.)  See Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1184 (Pa. Super. Ct. 2005) ("Our Supreme Court and this Court have consistently held that the victim of fraud in the inducement has two options:  (1) rescind the contract, or (2) affirm the contract and sue for damages." (citations omitted)).

(Pa. 1985)); see also Oak Ridge Constr. Co. v. Tolley, 504 A.2d 1343, 1346 (Pa. Super.

Ct. 1985).  A statement that is not "absolute and unequivocal" but expresses doubt

regarding the willingness or ability to perform under a contract warrants a request

for adequate assurances.  See Edwards, 335 F.3d at 273.

IR's proposal letters were submitted, according to Slade, at Hershey's

request.  The letters do not demand, but rather *propose*, that Hershey cover most of

the overrun costs.  IR's Assurances Letter stated that IR was willing and able to

perform under the contract[16] and that there "*may* likely be significant delays"

because of Hershey's changes to the Ride and the "*potential* need" to fabricate

portions of the Ride overseas.  Accordingly, a reasonable jury could find that IR did

not "absolute[ly] and unequivocal[ly]" refuse to perform under the contract or

evidence an inability to do so.[17]  Thus, Hershey's motion for summary judgment

motion on this claim will be denied.[18]

---

[16] IR requested that Hershey consider pricing changes, but IR did not
indicate that it would refuse to perform unless Hershey negotiated a change in
price.  Quite simply, IR was *attempting* to negotiate a change in the terms of the
contract.

[17] Hershey further contends that the Assurances Letter was untimely.
However, a reasonable jury could find that IR's December 6 Assurances Letter was
within the "reasonable period of time" provided for in section 7.1 of the Addendum
and, in the context of these Rule 56 motions, Hershey's contention is rejected.

[18] Because Hershey's request for summary judgment on the return of
purchase money paid to IR depends on its anticipatory repudiation claim (see
Doc. 31 at 10), Hershey's motion for summary judgment on this claim will also be
denied.

### D.    **Fraudulent Inducement to Contract**

Hershey seeks summary judgment on its fraudulent inducement to contract claim.  Under Pennsylvania law, the elements of fraudulent inducement, or fraudulent misrepresentation, are:

> (1) a representation; (2) which is material to the transaction at hand;
> (3) made falsely, with knowledge of its falsity or recklessness as to
> whether it is true or false; (4) with the intent of misleading another into
> relying on it; (5) justifiable reliance on the misrepresentation; and
> (6) the resulting injury was proximately caused by the reliance.

Eigen v. Textron Lycoming Reciprocating Engine Div., 874 A.2d 1179, 1185 (Pa. Super. Ct. 2005); see also Overall v. Univ. of Pa., 412 F.3d 492, 498 (3d Cir. 2005) (citing Gibbs v. Ernst, 647 A.2d 882, 889 (Pa. 1994)).  To succeed on this claim, a plaintiff must prove each element by clear and convincing evidence.[19]  Tran v. Metro. Life Ins. Co., 408 F.3d 130, 136 n.8 (3d Cir. 2005); see also Blumenstock v. Gibson, 811 A.2d 1029, 1034 (Pa. Super. Ct. 2002).

In the matter *sub judice*, Hershey claims that it justifiably relied, to its detriment, on IR's representation that IR would deliver the Ride at the promised price and time.  To demonstrate that IR's representation was made falsely and with the intent to induce Hershey to enter into the contract, Hershey points to IR's pre-contract statements in March 2004 about the potential tripling of steel prices.

---

[19] The court recognizes that it must "decide as a matter of law before [it] submits a case to the jury whether [Hershey's] evidence attempting to prove fraud is sufficiently clear, precise and convincing to make out a prima facie case." Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs., 951 F.2d 1399, 1409 (3d Cir. 1991).  The court, however, will defer this determination until all the evidence is presented at trial.

Hershey also points to IR's representation that it could lock in steel pricing if Hershey committed to the project before May, and that IR would not increase the contract price because of increased steel prices.  To these statements, Hershey juxtaposes IR's post-contract statement that it did not request a final quotation on the steel until October 2004—five months after Hershey entered into the agreement with IR—because IR's steel fabricators would not hold exact pricing until an order was placed.  Given these statements, a reasonable jury could conclude that IR made the steel cost and Ride price representations with recklessness as to their truth or knowledge of their falsity in order to induce Hershey to enter into the contract.  However, a reasonable jury could also find that IR did not intend to break its promise at the time it was made.  See Mellon Bank Corp. v. First Union Real Estate Equity & Mortgage Invs., 951 F.2d 1399, 1409-10 (3d Cir. 1991) ("Under Pennsylvania law, 'promises to do [or refrain from doing] future acts do not constitute a valid fraud claim' . . . [but a] 'statement of present intention which is *false when uttered* may constitute a fraudulent misrepresentation of fact.'" (emphasis added)); see also Piper v. Am. Nat'l Life Ins. Co. of Tex., 228 F. Supp. 2d 553, 560 (M.D. Pa. 2002) ("A broken promise is not fraud under Pennsylvania law unless the promisor had no intention of keeping the promise at the time it was made.").  This is clearly a jury issue and, therefore, Hershey's motion for summary judgment on this claim will be denied.

E.    **IR's Breach of Contract Counterclaim**

Hershey seeks summary judgment on IR's counterclaim alleging several instances of breach of contract.  Under Pennsylvania law, "[w]hen performance of a duty under a contract is due, any nonperformance is a breach."  <u>Widmer Eng'g, Inc. v. Dufalla</u>, 837 A.2d 459, 467 (Pa. Super. Ct. 2003) (citing RESTATEMENT (SECOND) OF CONTRACTS § 235(2) (1981)).  The non-breaching party has the right to suspend its performance only if the breach "constitutes a material failure of performance."  <u>Id.</u> The non-breaching party, however, may still recover damages for a non-material breach.  <u>See id.</u> at 468-69.

In the matter *sub judice*, IR claims that Hershey breached the contract by failing to make the first production payment on or before August 1, 2004 and failing to make the second production payment on or before October 1, 2004.  IR contends that, with the exception of incorporating the man-lift, it completed the preliminary and final designs of the Ride by the dates specified on the payment schedule.  IR asserts that Hershey was late with the first production payment and did not make the second production payment at all.  Hershey contends that it made the first production payment upon IR's belated completion of the preliminary design. Hershey also contends that IR never completed the final design and, therefore, the

second production payment was never due.[20]  Obviously, there are disputed

material facts with respect to this counterclaim, and the court will deny Hershey's

motion for summary judgment.

IR's counterclaim also contends that Hershey breached the contract by

failing to agree to increase, or negotiate an increase to, the price of the Ride to

account for Hershey's requested material changes to the Ride.  However, IR's

support for this claim—a change order submitted by Hershey—clearly

demonstrates that Hershey was willing to compensate IR for the increased cost of

the change.[21]  A reasonable jury could not conclude that Hershey failed to increase,

---

[20] Hershey also argues that it made the first production payment after
*receiving* the preliminary design and did not make the second production payment
because it never *received* the final design.  (See Doc. 40, at 16-17.)  In essence,
Hershey argues that the court should interpret the terms of the contract's payment
schedule, which specify that payment is to be made "*upon completion* of preliminary
design" and "*after* final design *is finished*," to require Hershey's receipt of the
design documents to trigger Hershey's obligation to make the payments.  However,
the cross motions for summary judgment do not specifically address this
interpretation or aver that the contract terms are ambiguous.  Thus, the court will
not address the issue at this time.  See Sanford Inv. Co. v. Ahlstrom Machinery
Holdings, Inc., 198 F.3d 415, 421 (3d Cir. 1999) ("[T]he court must make a
preliminary inquiry as to whether the contract before it is ambiguous.  This
question is an issue of law for the court to resolve." (citations omitted)); id. ("A term
is ambiguous if it is susceptible to reasonable alternative interpretations."); id. ("If
the court determines that a given term in a contract is ambiguous, then the
interpretation of that term is a question of fact for the trier of fact to resolve in light
of the extrinsic evidence . . . ."); Hullett v. Towers, Perrin, Forster & Crosby, Inc., 38
F.3d 107, 111 (3d Cir. 1994) ("[T]he judge must 'consider the words of the contract,
the alternative meaning suggested by counsel, and the nature of the objective
evidence to be offered in support of that meaning.'" (citation omitted)).  The parties
will be ordered to brief this issue before trial.

[21] Indeed, IR incorporated Hershey's suggested price adjustment for this
change order in its proposals to Hershey regarding the cost overrun issue.

or negotiate an increase to, the price of the Ride to account for its requested

material changes.  Accordingly, the court will grant Hershey's motion for summary

judgment on this claim.

Finally, IR claims that Hershey breached the contract by failing to provide

either adequate engineering and technical specifications for the man-lift or

possession of the actual man-lift and by failing to negotiate in good faith regarding

modifications to the contract to account for material changes in circumstances.

Under Pennsylvania law, "every contract has an implied term that the parties will

perform their duties in good faith."  Northview Motors, Inc. v. Chrysler Motors

Corp., 227 F.3d 78, 91 (3d Cir. 2000) (citing RESTATEMENT (SECOND) OF CONTRACTS

§ 205).  This general duty of good faith is used as an "interpretive tool to determine

the parties' justifiable expectations in the context of a breach of contract action"

and, except for very limited circumstances, does not give rise to an "independent

cause of action for breach of a duty of good faith and fair dealing."  Id.  Even the

good faith duty of the Uniform Commercial Code ("UCC"), as adopted by

Pennsylvania, "does not support an independent cause of action for failure to

perform or enforce in good faith."[22]  13 PA. CONS. STAT. ANN. § 1203  cmt.; see also

Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d Cir. 1995).

Because IR does not have an independent cause of action for breach of a duty of

---

[22] The resolution of this issue does not depend on the applicability of the UCC
to this case.  The court notes that both parties, without discussing the UCC's
applicability, use various UCC provisions in their briefs.  (See Doc. 31 at 7-8, 10;
Doc. 36 at 14.)

good faith, the court will interpret these claims as alleging a breach by interference with IR's performance of its contractual obligations.  See Somers v. Somers, 613 A.2d 1211, 1213 (Pa. Super. Ct. 1992) (recognizing certain categories of bad faith in the performance of contractual duties, including "interference with or failure to cooperate in the other party's performance" (citing RESTATEMENT (SECOND) OF CONTRACTS § 205 cmt. d)).

With respect to IR's allegations regarding the man-lift, a reasonable jury could conclude that Hershey's alleged failure to provide the necessary specifications or the actual man-lift breached the contract by interfering with IR's performance under the contract.  See id.  Despite Hershey's claims to the contrary, the record does not reveal numerous examples of technical specifications and information regarding the man-lift that Hershey provided to IR.  Accordingly, the court will deny Hershey's motion for summary judgment on this claim.

With respect to IR's claim that Hershey failed to negotiate in good faith, however, the court will grant summary judgment in favor of Hershey.  IR does not, and cannot, point to a contractual duty to negotiate modifications to the contract to account for material changes in circumstances.  Although IR desired a price increase to help with its cost overrun issue, Hershey was under no contractual obligation to negotiate such an increase and a reasonable jury could not conclude differently.  See Northview Motors, Inc. v. Chrysler Motors Corp., 227 F.3d 78, 91 (3d Cir. 2000); Duquesne Light Co. v. Westinghouse Elec. Corp., 66 F.3d 604, 617 (3d

Cir. 1995).  Therefore, the court will grant Hershey's motion for summary judgment on this claim.[23]

### F.   IR's Motion for Reconsideration of Court Order Denying Declaratory Relief

IR seeks a declaration that the express language of the contract bars Hershey from recovering incidental and consequential damages.  IR previously filed a motion seeking the identical relief.  (See Doc. 20.)  A prior order of court denied this motion.  (See Doc. 27.)  Hence, the court will construe the current motion for declaratory relief as a motion for reconsideration of the prior order of court.[24]

Motions for reconsideration serve to "correct manifest errors of law or fact" in a prior opinion of the court, or "to present newly discovered evidence" to be considered in reviewing the prior opinion.  See Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985); see also Dodge v. Susquehanna Univ., 796 F. Supp. 829, 830 (M.D. Pa. 1992) (cautioning that mere disagreement with the court does not translate into a clear error of law).  Such motions should not be used to "reargue

---

[23] IR also claims that Hershey breached the contract by filing the instant lawsuit and unilaterally repudiating and terminating the contract.  Whether Hershey's filing of the instant lawsuit breached the contract depends on the resolution of Hershey's claims against IR.  If the jury finds for IR on all of Hershey's claims, it could reasonably conclude that filing the instant lawsuit breached the contract.  Thus, the court will deny Hershey's motion for summary judgment with respect to this claim.

[24] Indeed, in its reply brief, IR states that it wants the court to "reconsider and change its previous ruling" on the issue of incidental and consequential damages.  (Doc. 39 at 6-7.)

matters already argued and disposed of." <u>Waye v. First Citizen's Nat'l Bank</u>, 846 F. Supp. 310, 314 (M.D. Pa. 1994).

IR's instant motion for declaratory relief merely repeats the arguments raised in its prior motion.  (<u>Compare</u> Doc. 29 at 5-7, <u>with</u> Doc. 21 at 4-5.)  IR does not allege manifest errors of law or fact in the prior order of court or present any newly discovered evidence.  Accordingly, the court will deny IR's current motion for declaratory relief, construed as a motion for reconsideration.

IV.   **Conclusion**

For the reasons set forth above, the cross motions for summary judgment are granted in part and denied in part.  An appropriate order will issue.

　　　　　　　　　　　　　　　  /s/ Christopher C. Conner
　　　　　　　　　　　　　　　CHRISTOPHER C. CONNER
　　　　　　　　　　　　　　　United States District Judge

Dated:　　　December 7, 2005

**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **HERSHEY ENTERTAINMENT &** | : | **CIVIL ACTION NO. 1:04-CV-2641** |
| **RESORTS COMPANY,** | : | |
| | : | **(Judge Conner)** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **INTERACTIVE RIDES, INC.,** | : | |
| | : | |
| **Defendant** | : | |

**ORDER**

AND NOW, this 7th day of December, 2005, upon consideration of the cross

motions for summary judgment (Docs. 28, 30), and for the reasons set forth in the

accompanying memorandum, it is hereby ORDERED that:

1.   Interactive Rides, Inc.'s motion (Doc. 28) for summary judgment is
     GRANTED with respect to the gross negligence and unjust
     enrichment claims.  The motion (Doc. 28) is otherwise DENIED.

2.   Hershey Entertainment & Resorts Company's motion (Doc. 30) for
     summary judgment is GRANTED with respect to Interactive Rides,
     Inc's breach of contract counterclaims for Hershey's alleged failure to
     negotiate a price increase or agree to increase the price of the Ride to
     account for material changes requested by Hershey and for Hershey's
     alleged failure to negotiate in good faith regarding modifications to the
     contract to account for material changes in circumstances.  The motion
     (Doc. 30) is otherwise DENIED.

3.   Hershey Entertainment & Resorts Company shall file, on or before
     December 14, 2005, a supplemental brief regarding the interpretation
     and/or ambiguity of the payment schedule terms.[25]

---

[25] See supra note 20.

      a.      Interactive Rides, Inc. shall file, on or before December 19, 2005, a brief in opposition.

      b.      Hershey Entertainment & Resorts Company shall be permitted to file, on or before December 23, 2005, a reply brief.

4.      The Clerk of Court is directed to defer the entry of judgment until the conclusion of this case.

          /s/ Christopher C. Conner
          CHRISTOPHER C. CONNER
          United States District Judge